JUDGE RAKOFF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

13 CV 3762

HIBU PLC f/k/a YELL GROUP PLC, and
HIBU, INC. f/k/a YELLOWBOOK, INC.,

                Plaintiffs,

        -against-

JOSEPH WALSH,

                Defendant.
------------------------------------------------------------x

13 Civ. _____ (    )

**NOTICE OF REMOVAL**

RECEIVED
JUN 0 3 2013
U.S.D.C. S.D. N.Y.
CASHIERS

**PLEASE TAKE NOTICE** that, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446,

Defendant Joseph Walsh ("Walsh"), by and through his attorneys, Cuti Hecker Wang LLP,

hereby removes the above-captioned case to the United States District for the Southern District

of New York.

     As grounds for removal, Defendant states as follows:

*The Complaint*

     1.     On or about April 26, 2013, Plaintiffs hibu plc f/k/a Yell Group plc ("hibu") and

hibu, Inc. f/k/a Yellowbook, Inc. ("hibu US") (collectively "Plaintiffs") filed this action entitled

*Hibu plc f/k/a Yell Group Plc, and Hibu, Inc. f/k/a Yellowbook, Inc. v. Joseph Walsh* (the

"Complaint") in the Supreme Court of the State of New York, County of New York (the "State

Court Action"). This case was assigned Index No. 651503/2013.

     2.     Defendant received a copy of the Complaint in the State Court Action on May 2,

2013, a copy of which is attached as Exhibit 1.

*Basis for Removal – Diversity Jurisdiction*

3. Plaintiff hibu is a public company that is chartered in the United Kingdom with its principal place of business in the United Kingdom.

4. Plaintiff hibu US is a public company corporation that is, upon information and belief, organized under the laws of the State of Delaware, and which maintains its principal place of business in Uniondale, New York.

5. Defendant Walsh is a citizen of the State of Maryland, residing in Montgomery County, Maryland.

6. The matter in controversy exceeds $75,000, exclusive of interests and costs, and is between citizens of different states, and a citizen of a foreign state is an additional party. Therefore, this Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(3), and removal of this action is proper pursuant to 28 U.S.C. § 1441(b).

7. Removal of this case on the basis of diversity of citizenship is not precluded by the provisions of 28 U.S.C. § 1441(b)(2) because Defendant Walsh is not a citizen of New York, the state within which this action was brought.

*Other Procedural Requirements*

8. Pursuant to 28 U.S.C. § 1446(a) and (b), this Notice of Removal is being filed in the United States District Court for the Southern District of New York within thirty days after May 2, 2013, *i.e.*, the date that Defendant received, through service or otherwise, a copy of the Complaint in the State Court Action.

9. In accordance with 28 U.S.C. § 1446(b), attached hereto are: Exhibit 1 (the Complaint), and Exhibit 2 (all other process, pleadings, and orders served upon the Defendant in the State Court Action).

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1441(a) because the State Court Action is pending in the Supreme Court of the State of New York, County of New York.

11. Promptly upon the filing of this Notice of Removal, a true copy of this Notice of Removal will be provided to all adverse parties pursuant to 28 U.S.C. § 1446(d). Pursuant to Fed. R. Civ. P. 5(d), Defendant Walsh will file with this Court a Certificate of Service of Notice to Adverse Parties of Removal to Federal Court.

12. Concurrently with the filing of this Notice of Removal, Defendant Walsh is filing a notification of Filing of Notice of Removal with the Clerk of the Supreme Court for the State of New York, County of New York, in accordance with 28 U.S.C. § 1446(d).

13. This Notice of Removal is signed pursuant to Fed. R. Civ. P. 11.

14. By filing this Notice of Removal, Defendant Walsh does not waive any defenses, including without limitation, lack of personal jurisdiction, improper venue or forum, all defenses specified in Fed. R. Civ. P. 12, or any other defense.

**WHEREFORE,** this action should proceed in the United States District Court of the Southern District of New York as an action properly removed thereto.

Dated: June 3, 2013
      New York, New York

CUTI HECKER WANG LLP

By: _____
    John R. Cuti
    Eric Hecker
    Alice G. Reiter

305 Broadway, Suite 607
New York, New York 10007
(212) 620-2600

*Attorneys for Defendant Joseph Walsh*

3

# EXHIBIT 1

FILED: NEW YORK COUNTY CLERK 04/26/2013

NYSCEF DOC. NO. 1

INDEX NO. 651503/2013

RECEIVED NYSCEF: 04/26/2013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF   New York

hibu plc f/k/a Yell Group plc
hibu, Inc. f/k/a Yellowbook, Inc.

                                    Plaintiff(s),

            -against-

Joseph Walsh

                                    Defendant(s).

Index No.

𝔖ummons

Date Index No. Purchased: 04/26/2013

To the above named Defendant(s)

Joseph Walsh
11600 Partridge Run Lane
Potomac, MD 20854

You are hereby summoned to answer the complaint in this action and to serve
a copy of your answer, or, if the complaint is not served with this summons, to serve
a notice of appearance, on the Plaintiff's attorney within 20 days after the service of
this summons, exclusive of the day of service (or within 30 days after the service is
complete if this summons is not personally delivered to you within the State of New
York); and in case of your failure to appear or answer, judgment will be taken against
you by default for the relief demanded in the complaint.

The basis of venue is  Section 12(b) of the Separation Agreement and General Release between Defendant and  ▣
which is  the contract underlying this dispute.

Dated:  April 26, 2013

                                    Kirkland & Ellis LLP
                                    by _Peter A. Bellacosa_

                                    Peter A. Bellacosa
                                    Attorneys for Plaintiff
                                    hibu plc
                                    601 Lexington Avenue
                                    New York, NY 10022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

HIBU plc f/k/a YELL GROUP plc, and ⟩
HIBU, Inc. f/k/a YELLOWBOOK, Inc., ⟩
⟩
       *Plaintiffs,* ⟩
⟩
     *v.* ⟩   Index No.:
⟩
JOSEPH WALSH, ⟩
⟩
       *Defendant.* ⟩
⟩

---

## COMPLAINT

Plaintiffs hibu plc f/k/a Yell Group plc ("hibu") and hibu, Inc. f/k/a Yellowbook,

Inc. ("hibu US"), for their Complaint against Defendant Joseph Walsh, allege as follows:

### NATURE OF THE CASE

1.     Defendant Joseph Walsh ("Walsh") is the former CEO of what became

hibu US, the US business of hibu.

2.     hibu US terminated Walsh's employment in October 2011 because he was

unwilling to support a new strategic direction for hibu's worldwide business. Upon his

termination, he signed a Separation Agreement and General Release (the "Separation

Agreement") which gave him $1,768,000 in a cash severance payment and stock rights. In

return, he promised among other things that he would not use hibu confidential information and

not make untrue, negative or derogatory statements about hibu or its management.  Walsh broke

those promises.

3.     Prior to his termination, Walsh had been authorized by the Board of

Directors (the "Board") on or about October 6, 2010, to oversee an effort to sell hibu US.  Walsh

was in contact with private equity firms seeking bidders, but was unsuccessful in consummating

1

a sale. In or about January 2011, Walsh was informed that hibu was no longer marketing hibu
US, and he was repeatedly instructed by or on behalf of the Board to cease his efforts in that
regard. At some later point in time, however, Walsh resolved to acquire the company himself
and was prepared to take whatever steps were necessary to do so, regardless of his obligations
under the Separation Agreement.

        4.    When hibu US terminated Walsh, he made his intentions clear. He told
both hibu's CEO and its General Counsel that he did not need to play by the rules that governed
other employees, and that he would "burn down [hibu]" and "take every senior manager with
him."

        5.    After leaving hibu, Walsh began a campaign to obtain confidential
information and to undermine management with negative and derogatory comments. He
remained in close but secret contact with certain senior hibu US executives who had worked for
him. He communicated with them frequently, even exchanging text messages with them *during*
confidential hibu strategy meetings, and he wrongfully obtained confidential business
information from them.

        6.    In or around October 2012, a year after his departure, Walsh teamed up
with one of the private equity firms to which he had tried to sell hibu US and, on October 24,
2012, made an offer to purchase the company. hibu did not pursue the offer. Working with
confederates in the company, Walsh initiated a negative letter writing campaign to undermine
hibu management. He encouraged employees to write to the company's lenders, even
anonymously, with negative and derogatory comments about management and to support
Walsh's efforts to acquire hibu US. His confederates even hosted off-site meetings of hibu US
employees to drum up further support for their attacks on management and to undermine the

company's business strategy. Walsh even reached out to at least one former employee and admitted the purpose and scope of his negative campaigning against management.

7.  Walsh's conduct is a blatant violation of the obligations that he undertook in his Separation Agreement. hibu seeks damages for breach of contract and for Walsh's misconduct. It also requests a permanent injunction preventing Walsh from continuing this wrongful conduct.

## THE PARTIES

8.  Plaintiff hibu is a UK plc with its registered office at One Reading Central, Forbury Rd, Reading. Berkshire, RG1 3YL, UK. hibu is listed on the London Stock Exchange and is a provider of informational directories and internet services facilitating millions of connections each year between consumers who want to find products and services locally and the merchants who provide them.

9.  Plaintiff hibu US is a US-based subsidiary of hibu and, along with hibu, was a party to Walsh's Separation Agreement. It maintains an office in Uniondale, New York.

10.  Defendant Walsh is the former CEO of hibu US. Walsh is a resident of the State of Maryland.

## JURISDICTION AND VENUE

11.  This Court has personal jurisdiction over Walsh pursuant to section 12(b) of the Separation Agreement, in which the parties agreed that disputes must be brought in a court in New York City. New York courts have construed similar agreements as consent to personal jurisdiction.

12.  Venue is proper in this Court pursuant to section 12(b) of the Separation Agreement, in which the parties agreed that disputes must be brought in a New York City court.

## FACTS

A.   **Walsh Threatens to "Burn Down" hibu and "Take Every Senior Manager With" Him**

13.     On July 1, 2006, Walsh entered an Employment Agreement with hibu to serve as the President and CEO of its US-based company.  7/1/2006 Walsh Employment Agreement ("Employment Agreement").  The Employment Agreement, among other things, prohibited Walsh from using or disclosing at any time during his employment or afterwards any Confidential Information, defined as "information that is not generally known to the public and that is used, developed or obtained by the Company or any of its Subsidiaries in connection with its business . . . ."  Employment Agreement, § 5.[1]

14.     Walsh reported to John Condron, hibu's long-serving CEO.  Condron announced his retirement in 2010, and in early 2011 was succeeded by Mike Pocock, to whom Walsh then began to report.  At Pocock's direction and with the approval of hibu's Board , hibu embarked upon a new strategy to consolidate the company's worldwide profit-centers and create a more cohesive, less costly global organization.  This included hibu US headed by Walsh.

15.     The Board and Pocock also decided to focus on digital and internet-based directory and business marketing services, and through these digital products extend the life of the declining print product.  Walsh opposed these strategies and worked against them.

---

[1]   Examples of Confidential Information set forth in the Employment Agreement included, without limitation, "(i) information, observations and data obtained by [Walsh] while employed by the Company (including those obtained prior to the date of [the] Agreement) concerning the business or affairs of the Company or any of its Subsidiaries, (ii) products or services, (iii) fees, costs and pricing structures, (iv) designs, (v) analyses, (vi) drawings, photographs and reports, (vii) computer software, including operating systems, applications and program listings, (viii) flow charts, manuals and documentation, (ix) data bases, (x) accounting and business methods, (xi) inventions, devices, new developments, methods and processes, whether patentable or unpatentable and whether or not reduced to practice, (xii) customers and clients and customer or client lists, (xiii) other copyrightable works, (xiv) all production methods, processes, technology and trade secrets, and (xv) all similar and related information in whatever form."  Employment Agreement, § 5(b).

4

16.     On October 20, 2011, Walsh was asked to resign amicably rather than be terminated for cause.  In a tumultuous meeting with Pocock, Walsh stated in words or in substance:  "Do you have any idea who I am?  I am Joe Walsh.  Do you know who David Beckham is?  I am to [hibu] who David Beckham is to the L.A. Galaxy....There are rules for everyone else and there are separate rules for me.  I am going to burn this place down around you and take every senior manager with me."

17.     Immediately after the Pocock meeting, Walsh met with hibu's General Counsel, Christian Wells, to discuss the terms of his Separation Agreement and, on several other occasions, spoke with Mr. Wells by telephone regarding his severance terms.  Walsh continued to make bizarre and threatening statements.  During a telephone call with Mr. Wells on or around October 25, 2011, Walsh indicated that he had very close relationships with hibu US employees and that they had all concluded that Walsh's departure from the company was sinister.  He ranted to Wells in a telephone call on or around November 16, 2011 that no one at hibu "had a clue." He said that Pocock was "the anti-Christ," and again threatened to "tear it [hibu] down," saying that he had thousands of employees asking him to be their reference and that hibu "wouldn't know what hit it."  He threatened that he "he had data" regarding the company which he would use.

B.     Walsh's Separation Agreement

18.     On December 1, 2011, Walsh entered into a Separation Agreement and General Release, memorializing his resignation.  12/1/2011 Separation Agreement and General Release among Walsh, hibu, and hibu US (the "Separation Agreement").  A true and correct copy of the Separation Agreement is attached as Exhibit A.

19.     The Separation Agreement superseded all prior agreements between Walsh and hibu US or hibu, including his Employment Agreement.  In exchange for significant

5

payments and options potentially worth millions of dollars, the Separation Agreement prohibited

Walsh from, among other things, using or disclosing Confidential Information (as defined in

Employment Agreement) or making "untrue, negative or derogatory statements or remarks"

about, among other companies, hibu, hibu US, or "any of their employees, directors, agents or

officers." Separation Agreement, ¶¶ 8, 12(a)(iii), 16.

C.   **Walsh Obtained Confidential Information Through Voluminous, Secret Communications with Certain hibu Executives**

20.     Walsh did not idly threaten to "burn" or "tear down" hibu US and take the

senior managers with him.  He knew that certain senior executives were willing to stay in secret

contact with him and to help him acquire hibu US whatever it took and regardless of Walsh's

obligations in his Separation Agreement.

21.     Walsh leaned on hibu US employees with whom he had worked for many

years to act disloyally and assist him every step of the way.  hibu learned only in recent weeks

that despite having left the company in October 2011, Walsh engaged in voluminous, secret

communications with key hibu US executives.  There was no proper reason for Walsh to discuss

hibu business with his former colleagues, much less with such frequency and in such great

volume.  His confederates included, among others:

- James McCusker - promoted to President of hibu US after Walsh's departure, and based in hibu's King of Prussia ("KOP"), Pennsylvania office;

- Mark Cairns - hibu's head of US and UK Operations, also based in KOP;

- Carleton "Gary" Shaw - hibu's Chief Information Officer; and

- John Gregory - a senior hibu marketing executive in the US.

22.     Throughout 2012 and at least into early 2013, Walsh regularly

communicated with these senior executives by telephone, text message and email.  Company

6

records show that there were well over 150 phone calls and/or voicemail exchanges between Walsh and one or more of these hibu executives. Over this time, long after Walsh had left the company, he spent approximately 13.4 hours on the phone talking with McCusker, 10.5 hours talking with Gregory, 7 hours talking with Shaw, and 5.4 hours talking with Cairns.

23. Attached as Exhibit B is a chart showing the number and frequency of Walsh's communications with these senior executives through hibu phone and email accounts. They do not include, because hibu does not yet have access to them, additional communications with Walsh that took place using private phones and email accounts.

24. The communications became more frequent during key times in Walsh's efforts to acquire hibu US. hibu has access to the contents of some of these communications. None shows that the purpose or content of the communications was only social or personal.

25. In or about October 4-5, 2012, hibu executives were meeting with representatives of Deloitte LLP, a restructuring advisor to hibu's CoCom,[2] which was conducting a confidential review of hibu's business plans and strategies. Around the same time, Walsh had eight phone calls with McCusker and Shaw. On October 5, Walsh emailed McCusker, who was participating in the Deloitte meetings: "[H]ow did you make out?" McCusker emailed back: "Good....will call you tomorrow to fill you in."

26. While these secret discussions were occurring, Walsh was preparing an offer to acquire hibu US. On October 18, 2012, he informed Houlihan Lokey, the financial advisor to the CoCom, that he had "partnered" with Platinum Equity, LLC to submit an offer,

---

[2] On September 4, 2012, hibu appointed a coordinating committee (the "CoCom") representing certain of its lenders to facilitate discussions regarding a restructuring of hibu's debt.

memorialized in an October 24, 2012, letter addressed to Houlihan Lokey. Exhibit C. hibu's Board declined to pursue Walsh's offer.

27.    At the same time, during the week of October 22-26, 2012, hibu was conducting a week-long, confidential business strategy meeting. In the days leading up to, during, and shortly after the meeting, Walsh was in direct communication with McCusker, Cairns, Shaw, and Gregory by phone, email and/or text message no fewer than seventeen times. On October 25, Walsh texted McCusker: "Give me a call when you finish."

28.    During the meeting, McCusker told Walsh by text message: "Not making last 65 mill payment to 2006 lenders." At the time of this message, information about the amount of the suspended payment was not public. Neither McCusker nor any other hibu or hibu US employee was authorized to disclose it, and Walsh knew that they had no such authority to do so. Information about hibu's financial affairs, including its relationship with its lenders, was highly sensitive and would have been valuable to anyone in Walsh's position trying to acquire the company. Walsh immediately responded by text: "Thanks for the heads up about the announcement....Let me know after the meeting."

29.    On November 2, 2012, after having sent his letter to Houlihan Lokey offering to buy part of the business of hibu US, Walsh telephoned Robert Wigley, Chairman of hibu's Board, and notified him of it. Walsh told Wigley that he had been working and "in ongoing discussion with [Platinum Equity] since 2 years" to acquire hibu US. While the Board had authorized Walsh in writing as of October 2010 to market hibu US on behalf of hibu, Walsh was told in or about January 2011 that hibu was halting the process. The Board had not authorized Walsh to continue working in his own interest to acquire hibu US, as he admitted to Wigley having done. In this conversation, Walsh also disclosed information unavailable to

anyone who had left the company a year earlier, including the company's business strategies, compensation, intentions of senior executives to stay or leave, expected losses in personnel, and his belief that senior executives had "antipathy for" management and its strategies. Wigley told Walsh that he wouldn't "comment on [Walsh's] invective about management or our strategy."

30.     The Board's unwillingness to entertain Walsh's October 24 offer did not deter him from continuing to solicit confidential information and undermining hibu management in support of his acquisition efforts.

31.     During a telephone conversation with Mr. Wells on December 18, 2012, Walsh revealed that he was aware of the specific number of planned hibu US headcount reductions that had been discussed only days earlier in a confidential discussion involving McCusker. No hibu employee in possession of that information was authorized to disclose it to Walsh or any other third party.

32.     On December 19, 2012, Gregory inadvertently addressed an email to Walsh's defunct hibu email account. It is likely that Gregory meant to send it to Walsh's private email account. In it, Gregory disclosed highly confidential information regarding hibu sales revenues for the previous week.

33.     On January 2, 2013, Walsh sent by email to Cairns, McCusker and Shaw a link to Platinum Equity's website, telling them that they are "terrific."

34.     hibu conducted another business strategy meeting on January 21-25, 2013, and, again, Walsh's communications with the hibu executives intensified. In the days immediately prior to and during the meeting, Walsh communicated with McCusker, Cairns and Gregory by telephone and text messaging no fewer than fifteen times.

9

35. Overall, from February 2012 into early 2013, there were at least 60 calls/voicemails between Walsh and McCusker; 24 calls or voicemails between Walsh and Cairns; 43 calls/voicemails between Walsh and Shaw; and 41 calls/voicemails between Walsh and Gregory. And, as Exhibit B shows, these communications tended to cluster around critical times when Walsh's confederates were participating in confidential business strategy meetings.

D.   **Walsh's Campaign to Spread Negative and Denigrating Information about hibu Management**

36. In January 2013, if not earlier, Walsh also began to solicit hibu US employees to undermine and criticize hibu management to the Board and the CoCom.

37. On January 18, 2013, in a voicemail left on McCusker's office phone, Walsh described the negative campaign against management and revealed the extent to which he and McCusker, among others, were working together to undermine management and assist Walsh in acquiring the company. Walsh told McCusker that he was assembling contact information for all Board and CoCom members. He would "blitz it very hard" and wanted McCusker to "put together as many of our leaders as we can and have them just maul these people," referring to the Board and CoCom. Walsh instructed McCusker to get "a dozen, fifteen, twenty, thirty, fifty, seventy people" at hibu US to write to the Board and the CoCom. Walsh even scripted the messages that compliant employees should be encouraged to send: "I can't work another day for Mike Pocock [hibu's CEO who had terminated Walsh]....We don't want to follow Mike Pocock anymore."

38. Walsh's voicemail made clear that his plan was to attack management's ability and skill with a barrage of messages ("just deluge the switchboards and just fill up their email inboxes") falsely portraying to the lenders a spontaneous uprising against supposedly ineffective management ("they'll be very worried about their investment"), so that he might

10

revive his failed offer to buy hibu US ("I think we can turn the tide"). In short, Walsh surreptitiously ran a negative propaganda campaign against management in direct violation of his Separation Agreement.

39.     Walsh and McCusker, among others, monitored the progress of this wrongful scheme. On February 7, 2013, Walsh left McCusker another voicemail revealing that he and McCusker had made good on the plan to deluge the Board and CoCom with negative letters about management. Walsh told McCusker that "[t]he letters are working. We had a pretty big breakthrough today, as result of your letters."

40.     The wrongful scheme and all of its wrongful particulars were independently confirmed in an email received by a hibu board member on February 12, 2013. A former hibu employee reported that Walsh had contacted him "a couple of weeks ago." Consistent with Walsh's voicemail messages to McCusker, Walsh was "trying to raise a campaign of named and anonymous communications to the CoCom which gives CoCom an alternative, and obviously negative, view" of management. Walsh even supplied the informant with a spreadsheet containing CoCom member contact information to encourage the informant to join the propaganda campaign.

41.     According to the informant, Walsh's "aim is to persuade CoCom that Joe's bid is their best option." The email further revealed that Walsh was being assisted secretly by McCusker and Cairns "in off site meetings at peoples [sic] homes, who are putting some pressure of [sic] members of their team [at hibu US] to join in." The informant concluded with an observation about Walsh's motive: "Joe…simply wants to buy the US business at a give away price."

42.     On February 28, 2013, Walsh personally telephoned a member of the CoCom based in the U.K. to report that he was rallying hibu US employees against management and to "come out" and support Walsh's offer to acquire the company.  Evidently reporting on this call, Walsh left a voicemail for Cairns on the same day stating that he was trying to track him down to "give [him] the answer" and "had managed to connect with the guys in the UK," and one for McCusker telling him that he had some important information and asking him to call him back.

## CLAIMS

### Count I -- Breach of Contract: Improper Use of Confidential Information

43.     Plaintiff incorporates by reference and realleges the allegations set forth in paragraphs 1 through 42 as if set forth herein.

44.     The Separation Agreement is a valid and binding contract.

45.     Plaintiff has performed its contractual obligations under the Separation Agreement in all respects.

46.     Walsh breached section 8 of the Separation Agreement by using hibu confidential information both during his October 2012 offer to purchase hibu US and during his subsequent attempt to undermine hibu's current management and at the same time possibly make a renewed bid for hibu US.

47.     hibu suffered damage as a result of Walsh's breach of section 8 of the Separation Agreement in an amount to be proven at trial.

### Count II -- Breach of Contract: Making Untrue, Negative, or Derogatory Statements

48.     Plaintiff incorporates by reference and realleges the allegations set forth in paragraphs 1 through 42 as if set forth herein.

49.     The Separation Agreement is a valid and binding contract.

12

50.     Plaintiff has performed its contractual obligations under the Separation Agreement in all respects.

51.     Walsh breached section 12(a)(iii) of the Separation Agreement, which prohibits Walsh from making "untrue, negative or derogatory statements or remarks" about hibu or its officers, directors, and employees.

52.     hibu suffered damage as a result of Walsh's breach of section 12(a)(iii) of the Separation Agreement in an amount to be proven at trial.

Count III -- Procurement of Information by Improper Means

53.     Plaintiff incorporates by reference and realleges the allegations set forth in paragraphs 1 through 42 as if set forth herein.

54.     Walsh improperly procured confidential information about hibu's business from hibu employees.

55.     As former CEO of hibu US, Walsh knew that he and the employees from whom he solicited confidential information were acting improperly.

56.     Walsh solicited confidential information about hibu's business for the purpose of a competing business interest, namely his repeated attempts to acquire hibu US and undermine current hibu management.

57.     hibu suffered damages as a result of Walsh's conduct in an amount to be proven at trial.

Count IV -- Conversion of Business Information

58.     Plaintiff incorporates by reference and realleges the allegations set forth in paragraphs 1 through 42 as if set forth herein.

13

59.     Walsh acquired confidential information about hibu's business from hibu employees through misconduct.

60.     As former CEO of hibu US, Walsh knew that he and the employees from whom he solicited confidential information were acting improperly and, thus, Walsh knew that the information was acquired through misconduct.

61.     hibu suffered damages as a result of Walsh's conduct in an amount to be proven at trial.

## Count V – Aiding and Abetting Breach of Fiduciary Duty

62.     Plaintiff incorporates by reference and realleges the allegations set forth in paragraphs 1 through 42 as if set forth herein.

63.     Cairns, McCusker, Gregory, and Shaw were hibu employees until March 6, 2013 in the case of Cairns and McCusker, March 25, 2013 in the case of Gregory, and January 16, 2013 in the case of Shaw.

64.     While they were employees of hibu, Cairns, McCusker, Gregory, and Shaw owed fiduciary duties of loyalty to hibu.

65.     Walsh knew that Cairns, McCusker, Gregory, and Shaw owed fiduciary duties of loyalty to hibu, and was aware that Cairns, McCusker, Gregory, and Shaw breached this duty by passing confidential information to Walsh and/or aiding in his scheme to undermine current management.

66.     Walsh substantially assisted and encouraged the breaches of the fiduciary duty of loyalty by Cairns, McCusker, Gregory, and Shaw.

67.     hibu suffered damages as a result of Walsh's conduct in an amount to be proven at trial.

14

Count VI -- Civil Conspiracy

68.     Plaintiff incorporates by reference and realleges the allegations set forth in paragraphs 1 through 42 as if set forth herein.

69.     Walsh unlawfully acted with Cairns, McCusker, Gregory, Shaw, and others to take and misuse hibu's confidential business information.

70.     Walsh acted in furtherance of the conspiracy by receiving confidential hibu information from hibu employees.

71.     hibu suffered damages as a result of the conspiracy in an amount to be proven at trial.

Count VII -- Permanent Injunction

72.     Plaintiff incorporates by reference and realleges the allegations set forth in paragraphs 1 through 42 as if set forth herein.

73.     Due to Walsh's misconduct, described above, hibu is clearly entitled to a permanent injunction enjoining and restraining Walsh from attempting to acquire or use hibu confidential information and from making untrue, negative or derogatory statements about hibu, its officers, employees, and directors.

74.     If Walsh is not permanently enjoined from this conduct, hibu will suffer irreparable harm. The harm hibu would suffer greatly outweighs any harm to Walsh resulting from a permanent injunction.

75.     hibu is likely to succeed on the merits of its claims against Walsh.

76.     An injunction is necessary to avoid an injury to hibu that cannot be compensated by damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

(i)     On Counts I-VI, damages against Walsh in excess of $150,000, the precise amount to be proven at trial;

1.     On Count VII, a permanent injunction prohibiting Walsh from improperly acquiring or using hibu confidential information and from making untrue, negative or derogatory statements about hibu, its officers, employees, and directors;

2.     Costs and attorneys fees; and

3.     Such other relief as this Court deems just and appropriate.

Dated: April 26, 2013
       New York, New York

KIRKLAND & ELLIS LLP

_Peter a. Bel_
_____

Peter A. Bellacosa
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Andrew R. McGaan, P.C.
Matthew E. Nirider
Rana Barakat
300 N. LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

FILED: NEW YORK COUNTY CLERK 04/26/2013

NYSCEF DOC. NO. 2

INDEX NO. 651503/2013

RECEIVED NYSCEF: 04/26/2013

# EXHIBIT A

## SEPARATION AGREEMENT AND GENERAL·RELEASE

WHEREAS, the Employment Agreement (the "Employment Agreement") entered into as of July 1, 2006, between Yellow Book USA, Inc., a Delaware corporation (the "Company"), and Joseph Walsh ("the "Executive") expired in accordance with its terms on June 30, 2009; and

WHEREAS, Executive has been employed without a contract as an at-will employee by the Company since July 1, 2009, serving the Company as its President and Chief Executive Officer; and

WHERAS the Company's name was changed to Yellowbook Inc. in April 2011; and

WHEREAS, negotiations between Executive and Yell Group plc, the ultimate parent corporation of the Company, with respect to the terms of the continued employment of Executive by the Company have proven unsuccessful; and

WHEREAS, Executive, the Company and Yell Group plc have reached an agreement by which Executive will separate from employment with the Company and Yell Group (as hereinafter defined), and resolve all matters in controversy, disputes and causes of action between them in an amicable fashion, on the terms set forth in this Separation Agreement and General Release (the "Separation Agreement"); and

WHEREAS, Executive has reached a full and final compromise and settlement of all matters, disputes, causes of action, claims and contentions between him and the Company and Yell Group plc and all of their respective divisions, affiliates, subsidiaries, funds, limited partnerships, parents, merged entities, branches, predecessors, successors, assigns, grantors, officers, directors, partners, members, managing members, shareholders, trustees, employees, agents, administrators, representatives, attorneys, employee benefit plans, insurers or fiduciaries, past, present or future (the "Released Parties"), whether in their individual or official capacities; and

WHEREAS, as a condition precedent to the Company and Yell Group plc performing their obligations as provided for in this Separation Agreement, Executive has agreed that he will execute and comply fully with the terms of this Separation Agreement; and

WHEREAS, Executive  (i) is advised in accordance with law to consult with legal counsel and/or such other personal and professional advisors of his choosing; (ii) understands that in executing the Separation Agreement he is, inter alia, giving up any rights and claims he may have under federal, state and local statutory, common and administrative law with respect to matters arising from or derivative of his employment with the Company, his separation from employment with the Company and Yell Group plc, including, but not limited to, Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq., ("ERISA"), the Fair Labor Standards Act, as amended, 29 U.S.C. § 201 et seq. ("FLSA"), the Americans with Disabilities Act of 1990, as amended, 29 U.S.C. § 12101 et seq. ("ADA"), the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 et seq., the Equal Pay Act, as amended, 29 U.S.C. § 206(d), the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A et seq. ("SOX"), the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 et seq. ("ADEA"), the Family and Medical Leave Act of 1992, 29 U.S.C. § 2601 et seq. ("FMLA"), the Reconstruction Era Civil Rights Act, as amended, 42 U.S.C. § 1981 et seq.; and (iii) has been given a period of not less than twenty-one (21) days within which to consider this Separation Agreement.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, Executive, the Company and Yell Group plc agree and covenant as follows:

1.    (a)    By entering into this Separation Agreement, Yell Group plc, the Company and the other Released Parties do not admit, and specifically deny, any liability or wrongdoing. It is expressly understood and agreed that this Separation Agreement is being entered into solely for the purposes of amicably resolving all matters in controversy, disputes and causes of action between Executive and the Company, Yell Group plc and other Released Parties.

(b)    For purposes of this Separation Agreement, (i) the term "Subsidiaries" shall signify (A) any corporation of which the securities having a majority of the voting power in electing directors are at the time of determination, owned by Yell Group plc or the Company (as context dictates), directly or through one or more Subsidiaries and (B) any other entity of which Yell Group plc or the Company (as applicable) acquires at least 50% of such entity's ownership interests; (ii) "Company" shall be deemed to include its Subsidiaries; (iii) "Yell Group plc" shall be deemed to include its Subsidiaries, and (iv) "Yell Group" shall mean Yell Group plc and its Subsidiaries and the Company and its Subsidiaries.

2.    Executive's employment with the Company terminated as of October 20, 2011 (the "Termination Date"), and Executive hereby resigns his offices as President and Chief Executive Officer of the Company effective as of October 20, 2011. Executive shall receive base salary at his current rate through the Termination Date.

3.    In consideration of Executive's promises and obligations as set forth in this Separation Agreement:

(a)    the Company and/or Yell Group plc shall pay to Executive, as severance,

(i)    the gross amount of $968,000.00, and

(ii)    a pro-rata payment in respect of a 2011 bonus in the gross amount of $800,000.00,

in each case less all tax and any other applicable withholdings, social security (or similar) liabilities and any other deductions required by law (in any jurisdiction) ("Tax Liabilities"). These amounts shall be payable as follows:

    (x)    The gross amount of $713,263.16, payable in 14 nearly equally installments, with payment commencing on the Company's next regular payroll date that is not less than ten (10) business days following the expiration of the Rescission Period as defined in Paragraph 15 hereof ("First Payment Date"), provided, however, that the payment to be made on the First Payment Date shall include such number of installments as is equal to the number of the Company's bi-weekly payroll dates that have occurred between October 21, 2011 and such First Payment Date, with subsequent installments paid on the Company's regular bi-weekly payroll dates thereafter until the balance of said gross amount of $713,263.16 has been paid;

    (y)    The gross amount of $800,000.00 on the later of (i) April 20, 2012, and (ii) within five (5) business days following the expiration of the Rescission Period as defined in Paragraph 15 hereof; and

    (z)    The gross amount of $254,736.84 on or before September 30, 2012.

  (b)    Yell Group plc's Remuneration Committee will exercise its discretion under:

    (i)    Rule 10.1 of the Yell Group plc Executive Share Option Scheme ("ESOS"), to allow an option over 14,095,100 ordinary shares, granted on November 13, 2008, at an adjusted exercise price per ordinary share of 64.5p; an option over 1,750,000 ordinary shares, granted on March 29, 2011, at an exercise price per ordinary share of 7.71p; and an option over 1,750,000 ordinary shares, granted on June 28, 2011, at an exercise price per ordinary share of 5.16p (together the "ESOS Options") to be exercised and that the performance conditions attached to the ESOS Options be waived having due regard to the performance of the Company over the period of time since the ESOS Options were granted; and

    (ii)    Rule 10.2 of the ESOS to defer the lapse date of the ESOS Options until 2 years from the Termination Date; and

    (iii)    Section 6(g)(i) of the Equity Incentive Plan Stock Option Agreement ("EIP Agreement") granted under the Yell Group plc 2003 US Equity Incentive Plan ("EIP"), to allow an option over 651,484 ordinary shares, granted on July 15, 2003, at an adjusted exercise price per ordinary share of £2.7342 (the "July 2003 EIP Option") and an option over 1,202,758 ordinary shares, granted on November 14, 2003, at an adjusted exercise price per ordinary share of £2.8378 (the "November 2003 EIP Option") (together the "EIP Options") to be exercised and to waive the performance conditions attached to the EIP Options (to the extent not already satisfied) having due regard to the performance of the Company over the period of time since the EIP Options were granted; and

4

(iv)    Section 6(g)(ii) of the EIP Agreement to defer the lapse date of the EIP Options until July 15, 2013 (for the July 2003 EIP Option) and November 14, 2013 (for the November 2003 EIP Option) which are the long-stop dates, being the tenth anniversaries of the dates the EIP Options were granted;

(c)    the Remuneration Committee will recommend to the trustee of the Yell Employee Benefit Trust that it should consider transferring to the Executive on or shortly after the Termination Date such number of ordinary shares in the Company as the trustee may determine, but not exceeding the proportion of 6,792,029 ordinary shares subject to the award granted to the Executive on December 23, 2009 under the Yell Group plc Long-Term Incentive Plan ("LTIP"), corresponding to the time which has elapsed from the Award Date (as defined in the LTIP) to the Termination Date, as compared to 36 months;

(d)    In satisfaction of Executive's award over 235,661 ordinary shares under the Yell Group plc Deferred Bonus Plan ("DBP"), such number of Shares in the Company will be transferred to the Executive on or shortly after the Termination Date, subject to the terms and conditions of the DBP;

(e)    the exercise and/or vesting of any options and/or awards under the ESOS, EIP and DBP ("Share Plans") will be subject to the terms and conditions of the applicable Share Plans. Any cash and/or shares to be acquired by the Executive pursuant to the Share Plans, the Company's employee benefit trust and/or the terms of this Separation Agreement will be subject to all Tax Liabilities. The Executive authorizes the Company, or any group company, to withhold such Tax Liabilities from any payments due to be made to the Executive and/or arrange for the sale of sufficient shares to be sold to meet the Executive's Tax Liabilities; and

(f)    the Chief Executive Officer of Yell Group plc shall announce that Executive has resigned from the Company and Yell Group effective as of the Termination Date to pursue personal interests, and shall issue a formal announcement to that effect, which Executive shall have the opportunity to review prior to issuance.

4.    (a) Following the Termination Date, Executive will be entitled to receive (i) any accrued but unpaid Base Salary through the Termination Date; (ii) any accrued but unpaid bonus for 2010 (if any); (iii) accrued but unpaid vacation through the Termination Date, equivalent to 20 days Base Salary; (iv) reimbursement, within sixty (60) days following his submission of appropriate supporting documentation, for any unreimbursed Business Expenses incurred by him prior to the Termination Date in accordance with Company policy (provided claims for such reimbursement, accompanied by appropriate supporting documentation, are submitted to the Chief Executive Officer of Yell Group plc within ninety (90) days following the Termination Date; (v) any monies deducted from Executive's salary during 2011 under the Yell Group plc 2003 Employee Stock Purchase Plan ("ESPP"); and (vi) any other or additional benefits to which he may be entitled in accordance with the terms of applicable employee benefit plans of the Company or Yell Group plc.

086695-0037-00333-12719335