(b)  Upon the submission by Executive of an appropriate statement to the Company for reasonable attorneys' fees incurred by Executive and directly related to Executive receiving legal and/or accounting professional advice and representation on the negotiation and execution of this Separation Agreement, up to a maximum of $15,000.00 for all such purposes, the Company will pay or cause to be paid to Executive such amount to Executive's counsel and/or accountant. Such payment will be made by the later of (i) twenty-one (21) days following the expiration of the Rescission Period as defined in Paragraph 15 hereof, and (ii) twenty-one (21) days following the submission by Executive of the statement described in this subparagraph.

(c)  The Company agrees not to contest Executive's hiring and employment of his former assistant while employed at the Company after she is severed by the Company, provided that the Executive's former assistant does not violate her duties to the Company with respect to the retention or use of any confidential information or other property of the Company over which she possession, custody or control.

(d)  Executive acknowledges that the Company has provided him with the laptop, mobile telephone, facsimile machine and scanner that he used in his office while employed by the Company, with storage drives and memory "wiped", and that Executive may retain these devices.

(e)  The Company agrees to provide outplacement services to Executive through a recognized outplacement firm of the Company's choosing, at a cost to the Company of no more than $20,000.00, with the services to be provided in the Washington, DC area.

5.     The Company and Yell Group plc acknowledge the terms of the August 2010 letter relating to the payment to Executive of a retention bonus (the "Retention Bonus Letter"), and shall pay Executive, within five (5) business days following the later of (a) the date stated in the Retention Bonus Letter and (b) the expiration of the Rescission Period as defined in Paragraph 15 hereof, the amount stated in the fourth sentence of the Retention Bonus Letter.

6.     Executive's eligibility to continue participation in the Company's employee benefit plans and programs, including but not limited to medical and dental coverage, accidental death and dismemberment, short and long-term disability insurance, life insurance, annual bonus plan and qualified 401(k) plan, the ESOS, the EIP, the LTIP, the DBP, and the ESPP, will cease as of the Termination Date. Executive will be eligible to continue group health insurance coverage after the Termination Date at his expense in accordance with the provisions of COBRA, provided, however, that the Company will pay Executive's COBRA expenses for a period of 28 weeks with the first such week being the week that commences not less than ten (10) business days after the Rescission Period as defined in Paragraph 15 hereof ends.

7.     Subject to the provisions of Section 4(d) hereof, Executive represents and affirms that he has returned to the Company any Company Property (as hereinafter defined) or "Work Product" (as defined in Section 6 of the Employment Agreement), or any copies thereof, which he may have had in his possession, custody or control, as well as any property or work product of other of the Separation Agreement Parties. As used herein, Company Property shall include, but not be limited to, all records; files; electronic media; equipment; memoranda; manuscripts; reports; intellectual property rights; other literary property, author rights, copyrightable works and works

of authorship in any other media (whether or not copyrightable); client information; client lists; documents; equipment; building keys; corporate credit card; computer; and electronic communication equipment (*i.e.,* laptop, cellular phone, blackberry, etc.); and the like, in which the Company or Yell Group (as applicable) has an interest, whether direct or indirect. If Executive should subsequently discover any such property in his possession, he shall promptly return it and all copies thereof to the Company or Yell Group, as appropriate.

8.      Executive acknowledges his obligation not to disclose or use, at any time, any and all Confidential Information (as defined in Section 5(b) of the Employment Agreement) of the Company, Yell Group and any other of the Released Parties, unless disclosure is required by law, or necessary to respond in an appropriate manner to any legal process or give appropriate and truthful testimony in a legal or regulatory proceeding, and provided, however, that nothing contained in this Section 8 of the Separation Agreement or in Section 5 of the Employment Agreement shall prohibit or limit Executive from testifying truthfully, or disclosing information to government officials strictly in accordance with applicable law.  Confidential Information shall not include all such information available to the public through no fault of Executive or information that the Company or the Yell Group does not treat as being confidential.  Unless prohibited from doing so by law or at the express request of the applicable law enforcement or regulatory agency, Executive agrees to inform the Chief Executive Officer of the Board of Directors of Yell Group plc and the Company, promptly and in writing, if he is required to give testimony or provide any information to any law enforcement or regulatory agency in connection with the Company's or Yell Group's business practices, setting forth the subject matter of the testimony or speech and identifying the agency.

9.      Executive represents and affirms that he has not filed or asserted any charges, claims or complaints, or initiated any proceedings, against the Company, Yell Group plc or any other of the Released Parties with any court or governmental or regulatory agency, or at arbitration, including making any claim, charge or assertion of wrongdoing of any kind by the Company or Yell Group plc, any of their employees, officers or directors, and that he does not have a basis to make such claim, charge or assertion.

10.     (a)     Executive, for and in consideration of the payments and other benefits that are to be provided to him as set forth in this Separation Agreement, and for other good and valuable consideration, hereby releases and forever discharges, and by this Separation Agreement does release and forever discharge, the Company, Yell Group plc, and all other Released Parties from any  and all causes of action, suits, agreements, promises, damages, disputes, controversies, contentions, differences, judgments, claims debts, dues, obligations, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, variances, trespasses, extents, executions and demands of any kind whatsoever, which Executive or his heirs, executors, administrators, successors and assigns ever had, now have or may have against the Released Parties or any of them, in law, admiralty or equity, whether known or unknown to Executive, for, upon, or by reason of, any matter, action, omission, course or thing whatsoever occurring up to and including the date this Separation Agreement is signed by Executive, including, without limitation, in connection with or in relationship to his employment or other service relationship with any of the Released Parties, the termination of any such employment or service relationship and any applicable employment, compensatory or equity arrangement with the Company or any applicable Released Party, or otherwise; *provided* that such released claims shall not include any

claims to enforce Executive's rights under, or with respect to, this Separation Agreement (such released claims are collectively referred to herein as the "Released Claims").

(b)     Notwithstanding the generality of clause (a) above, the Released Claims include, without limitation, (i) any and all claims under Title VII, ERISA, FLSA, ADA, the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 et seq., the Equal Pay Act, as amended, 29 U.S.C. § 206(d), SOX, ADEA, FMLA, the Reconstruction Era Civil Rights Act, as amended, 42 U.S.C. § 1981 et seq.; and (ii) any and all other federal, state or local laws, statutes, rules and regulations pertaining to employment or otherwise, and (iii) any claims for wrongful discharge, breach of contract, fraud, misrepresentation, unjust enrichment or any compensation claims, or any other claims under any statute, rule or regulation or under the common law, including compensatory damages, punitive damages, attorney's fees, costs, expenses and all claims for any other type of damage or relief.

(c)     THIS MEANS THAT, BY SIGNING THIS SEPARATION AGREEMENT, EXECUTIVE WILL HAVE WAIVED ANY RIGHT HE MAY HAVE HAD TO BRING A LAWSUIT OR MAKE ANY CLAIM AGAINST THE RELEASED PARTIES BASED ON ANY ACTS OR OMISSIONS OF THE RELEASEES UP TO THE DATE OF THE SIGNING OF THIS SEPARATION AGREEMENT.

(d)     The Company and Yell Group plc, for and in consideration of the obligations upon Executive as set forth in this Separation Agreement, and for other good and valuable consideration, hereby release and forever discharge, and by this Separation Agreement does release and forever discharge, Executive from any  and all causes of action, suits, agreements, promises, damages, disputes, controversies, contentions, differences, judgments, claims debts, dues, obligations, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, variances, trespasses, extents, executions and demands of any kind whatsoever, which the Company and Yell Group plc or their subsidiaries, affiliates, administrators, successors and assigns (the "Company Releasors") ever had, now have or may have against Executive in law, admiralty or equity, whether known or unknown to the Company Releasors, for, upon, or by reason of, any matter, action, omission, course or thing whatsoever occurring up to and including the date this Separation Agreement is signed by the Company Releasors, including, without limitation, in connection with or in relationship to Executive's employment or other service relationship with any of the Released Parties, the termination of any such employment or service relationship and any applicable employment, compensatory or equity arrangement with the Company or any applicable Released Party, or otherwise; *provided* that such released claims shall not include any claims to enforce any of the Company Releasors' rights under, or with respect to, this Separation Agreement or the benefit and compensation plans expressly referred to herein, and *provided further*, that such released claims shall not include any claims by any of the Company Releasors based upon conduct by Executive which constitutes a crime or is fraudulent under applicable law.

11.     Except as expressly set forth in this Separation Agreement, Executive expressly understands and agrees that the obligations upon the Company and Yell Group plc under this Separation Agreement are in lieu of any and all other amounts to which Executive might be, is now or may become entitled to receive from the Company, Yell Group plc or any other of the Released Parties upon any claim whatsoever and, without limiting the generality of the

8

foregoing, Executive expressly waives any right or claim that he may have or assert to employment, reinstatement to employment, or payment for back pay, front pay, interest, bonuses, equity pool participation, discretionary investments, damages, vacation, sick leave, medical, dental, optical or hospitalization benefits, accidental death and dismemberment coverage, long term disability coverage, stock-based options or awards, pensions, expense reimbursements, education benefits, automobile usage benefits, life insurance benefits, overtime, severance pay, separation pay, liquidated damages and/or attorneys' fees or costs, arising from or derivative of the Employment Agreement, his employment with the Company, his separation from employment with the Company or the Yell Group, or otherwise.

12.     (a)     Executive hereby covenants and agrees, as a condition of the Company's and Yell Group plc's performance of their obligations arising from this Separation Agreement, that Executive: (i) has not disclosed and shall not disclose the terms of this Separation Agreement to anyone, except and to the extent required by law, provided, however, that this does not and shall not preclude disclosure about the terms of this Separation Agreement to Executive's immediate family members, counsel, and financial, personal and tax advisors (if any) or governmental taxing authorities; (ii) has instructed his immediate family members, counsel, and financial, personal and tax advisors (if any) to whom he has disclosed or may disclose the terms of this Separation Agreement not to disclose the terms and conditions of this Separation Agreement to anyone except where failure to disclose would constitute a violation of law or contempt of court; and (iii) will not make any untrue, negative or derogatory statements or remarks about the Company or Yell Group plc, or any of their employees, directors, agents or officers (past, present or future) or any other of the Released Parties except that this shall not prevent any person from giving true testimony pursuant to subpoena and under oath in any proceeding.

        (b)     Executive further agrees that any material violation or breach by him of any of the obligations set forth in Paragraphs 7, 8, 9 or 12(a) of this Separation Agreement will give rise on the part of the Company and Yell Group plc to a claim for relief to recover from Executive, before a court of competent jurisdiction in New York City, the full amounts paid to Executive under Paragraph 3 hereof, and to obtain all other remedies provided by law or equity, but shall not release Executive from the performance of his obligations under this Separation Agreement.

        (c)     The Company and Yell Group plc agree that Tony Bates, Bob Gregerson, Rob Hall, Mark Payne, Mike Pocock, John Salmond and Christian Wells will not make any untrue, negative or derogatory statements or remarks about Executive except that this shall not prevent any person from giving true testimony pursuant to subpoena and under oath in any proceeding.

13.     Notwithstanding anything herein to the contrary, (a) if at the time of the Termination Date, Executive is a "specified employee" as defined in Section 409A of the U.S. Internal Revenue Code (the "Code") and the deferral of the commencement of any payments or benefits otherwise payable hereunder as a result of Employee's termination of employment is necessary in order to prevent any accelerated or additional tax under Section 409A of the Code, then the Company (or Yell Group plc, as applicable) will defer the commencement of the payment of any such payments or benefits hereunder (without any reduction in such payments or benefits ultimately paid or provided to Executive) until the date that is six months following the Termination Date (or the earliest date as is permitted under Section 409A of the Code), and (b) if any other payments of money or other benefits due to Executive hereunder could cause the

application of an accelerated or additional tax under Section 409A of the Code, such payments or other benefits shall be deferred if deferral will make such payment or other benefits compliant under Section 409A of the Code, or otherwise such payment or other benefits shall be restructured, to the extent possible, in a manner, determined by the Board, that does not cause such an accelerated or additional tax. The Company and Yell Group plc shall consult with Executive in good faith regarding the implementation of the provisions of this Section 14; *provided* that neither the Company, Yell Group plc, nor any of their employees or representatives shall have any liability to Executive with respect to thereto.

14.     (a)     The Company, Yell Group plc and Executive agree to execute such other documents and to take such other actions as may be reasonably necessary to effect the terms of this Separation Agreement.

        (b)     Executive acknowledges and agrees that he has read carefully and fully understands the terms of this Separation Agreement and that, in deciding to execute this Separation Agreement, he has relied entirely upon his own judgment, and that he has had the opportunity to consult with legal, financial and other personal advisors of his own choosing as he deems appropriate, in assessing whether to execute this Separation Agreement. Executive represents and acknowledges that no representation, statement, promise, inducement, threat or suggestion has been made by the Company, Yell Group plc or any other of the Released Parties to influence his decision to sign this Separation Agreement except such statements as are expressly set forth in this Separation Agreement. Executive understands that he has been advised by the Company and Yell Group plc to consult with counsel prior to executing this Separation Agreement, and that he has been given at least twenty-one (21) days to consider its terms and effect and to consult with, and to ask any questions that he may have of his legal counsel and other personal advisors of his own choosing, and that he has executed this Separation Agreement voluntarily and with full understanding of its terms and effect. Executive further agrees that no fact, evidence, event or transaction currently unknown to him but which later may become known to him shall affect in any way or manner the final and unconditional nature of this Separation Agreement.

15.     Executive understands that he has a period of seven (7) days following the date on which he signs this Separation Agreement to revoke such signature (the "Rescission Period"). Accordingly, this Separation Agreement shall not become effective until the eighth (8th) day following the date on which Executive signs this Separation Agreement as indicated below.  No payments shall be due, owing or paid by the Company or Yell Group plc under this Separation Agreement unless and until the Separation Agreement becomes effective upon expiration of the Rescission Period. To revoke his execution of this Separation Agreement, Executive must send a written statement of revocation to the Chief Executive Officer of the Board of Directors of Yell Group plc, which statement of revocation must be received no later than 5:00 p.m. on the seventh (7th) day following Executive's execution of this Separation Agreement.

16.     The foregoing represents the entire agreement among Executive, the Company and Yell Group plc and except as expressly set forth in this Separation Agreement, supersedes all prior agreements or understandings, written or oral, between or among them (except for the Retention Bonus Letter) which are hereby no longer of any force or effect and are extinguished. This

10

Separation Agreement may not be changed or modified except by a written instrument signed by each of Executive, the Company and Yell Group plc.

17.     Each party to this Separation Agreement agrees that if any section of this Separation Agreement is determined to be void, voidable or unenforceable, it shall have no effect on the remainder of the Separation Agreement which shall remain in full force and effect.

18.     This Separation Agreement shall be governed by the laws of the State of New York.

Dated: as of October 20, 2011                    YELLOWBOOK INC.

 

 

By: _____

Its:

YELL GROUP PLC

 

 

By: _____

Its:

_____

JOSEPH WALSH

STATE OF Maryland

: ss.:

COUNTY OF Montgomery

        On the ___ day of December, 2011, before me personally came Joseph Walsh, to me known and known to me to be the individual described herein and who executed the foregoing  Separation Agreement and General Release, and duly acknowledged to me that he executed the same.

_____
                                                Notary Public

(Seal)

JACQUELINE B. LEESE
Notary Public
State of Maryland
Montgomery County
My commission exp. October 14, 2014

Execution Copy

## SEPARATION AGREEMENT AND GENERAL RELEASE

WHEREAS, the Employment Agreement (the "Employment Agreement") entered into as of July 1, 2006, between Yellow Book USA, Inc., a Delaware corporation (the "Company"), and Joseph Walsh ("the "Executive") expired in accordance with its terms on June 30, 2009; and

WHEREAS, Executive has been employed without a contract as an at-will employee by the Company since July 1, 2009, serving the Company as its President and Chief Executive Officer; and

WHERAS the Company's name was changed to Yellowbook Inc. in April 2011; and

WHEREAS, negotiations between Executive and Yell Group plc, the ultimate parent corporation of the Company, with respect to the terms of the continued employment of Executive by the Company have proven unsuccessful; and

WHEREAS, Executive, the Company and Yell Group plc have reached an agreement by which Executive will separate from employment with the Company and Yell Group (as hereinafter defined), and resolve all matters in controversy, disputes and causes of action between them in an amicable fashion, on the terms set forth in this Separation Agreement and General Release (the "Separation Agreement"); and

WHEREAS, Executive has reached a full and final compromise and settlement of all matters, disputes, causes of action, claims and contentions between him and the Company and Yell Group plc and all of their respective divisions, affiliates, subsidiaries, funds, limited partnerships, parents, merged entities, branches, predecessors, successors, assigns, grantors, officers, directors, partners, members, managing members, shareholders, trustees, employees, agents, administrators, representatives, attorneys, employee benefit plans, insurers or fiduciaries, past, present or future (the "Released Parties"), whether in their individual or official capacities; and

WHEREAS, as a condition precedent to the Company and Yell Group plc performing their obligations as provided for in this Separation Agreement, Executive has agreed that he will execute and comply fully with the terms of this Separation Agreement; and

WHEREAS, Executive (i) is advised in accordance with law to consult with legal counsel and/or such other personal and professional advisors of his choosing; (ii) understands that in executing the Separation Agreement he is, inter alia, giving up any rights and claims he may have under federal, state and local statutory, common and administrative law with respect to matters arising from or derivative of his employment with the Company, his separation from employment with the Company and Yell Group plc, including, but not limited to, Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq., ("ERISA"), the Fair Labor Standards Act, as amended, 29 U.S.C. § 201 et seq. ("FLSA"), the Americans with Disabilities Act of 1990, as amended, 29 U.S.C. § 12101 et seq. ("ADA"), the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 et seq., the Equal Pay Act, as amended, 29 U.S.C. § 206(d), the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A et seq. ("SOX"), the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 et seq. ("ADEA"), the Family and Medical Leave Act of 1992, 29 U.S.C. § 2601 et seq. ("FMLA"), the Reconstruction Era Civil Rights Act, as amended, 42 U.S.C. § 1981 et seq.; and (iii) has been given a period of not less than twenty-one (21) days within which to consider this Separation Agreement.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, Executive, the Company and Yell Group plc agree and covenant as follows:

1. (a) By entering into this Separation Agreement, Yell Group plc, the Company and the other Released Parties do not admit, and specifically deny, any liability or wrongdoing. It is expressly understood and agreed that this Separation Agreement is being entered into solely for the purposes of amicably resolving all matters in controversy, disputes and causes of action between Executive and the Company, Yell Group plc and other Released Parties.

(b) For purposes of this Separation Agreement, (i) the term "Subsidiaries" shall signify (A) any corporation of which the securities having a majority of the voting power in electing directors are at the time of determination, owned by Yell Group plc or the Company (as context dictates), directly or through one or more Subsidiaries and (B) any other entity of which Yell Group plc or the Company (as applicable) acquires at least 50% of such entity's ownership interests; (ii) "Company" shall be deemed to include its Subsidiaries; (iii) "Yell Group plc" shall be deemed to include its Subsidiaries, and (iv) "Yell Group" shall mean Yell Group plc and its Subsidiaries and the Company and its Subsidiaries.

2. Executive's employment with the Company terminated as of October 20, 2011 (the "Termination Date"), and Executive hereby resigns his offices as President and Chief Executive Officer of the Company effective as of October 20, 2011. Executive shall receive base salary at his current rate through the Termination Date.

3. In consideration of Executive's promises and obligations as set forth in this Separation Agreement:

(a) the Company and/or Yell Group plc shall pay to Executive, as severance,

(i) the gross amount of $968,000.00, and

(ii) a pro-rata payment in respect of a 2011 bonus in the gross amount of $800,000.00,

in each case less all tax and any other applicable withholdings, social security (or similar) liabilities and any other deductions required by law (in any jurisdiction) ("Tax Liabilities"). These amounts shall be payable as follows:

(x) The gross amount of $713,263.16, payable in 14 nearly equally installments, with payment commencing on the Company's next regular payroll date that is not less than ten (10) business days following the expiration of the Rescission Period as defined in Paragraph 15 hereof ("First Payment Date"), provided, however, that the payment to be made on the First Payment Date shall include such number of installments as is equal to the number of the Company's bi-weekly payroll dates that have occurred between October 21, 2011 and such First Payment Date, with subsequent installments paid on the Company's regular bi-weekly payroll dates thereafter until the balance of said gross amount of $713,263.16 has been paid;

(y) The gross amount of $800,000.00 on the later of (i) April 20, 2012, and (ii) within five (5) business days following the expiration of the Rescission Period as defined in Paragraph 15 hereof; and

(z) The gross amount of $254,736.84 on or before September 30, 2012.

(b) Yell Group plc's Remuneration Committee will exercise its discretion under:

(i) Rule 10.1 of the Yell Group plc Executive Share Option Scheme ("ESOS"), to allow an option over 14,095,100 ordinary shares, granted on November 13, 2008, at an adjusted exercise price per ordinary share of 64.5p; an option over 1,750,000 ordinary shares, granted on March 29, 2011, at an exercise price per ordinary share of 7.71p; and an option over 1,750,000 ordinary shares, granted on June 28, 2011, at an exercise price per ordinary share of 5.16p (together the "ESOS Options") to be exercised and that the performance conditions attached to the ESOS Options be waived having due regard to the performance of the Company over the period of time since the ESOS Options were granted; and

(ii) Rule 10.2 of the ESOS to defer the lapse date of the ESOS Options until 2 years from the Termination Date; and

(iii) Section 6(g)(i) of the Equity Incentive Plan Stock Option Agreement ("EIP Agreement") granted under the Yell Group plc 2003 US Equity Incentive Plan ("EIP"), to allow an option over 651,484 ordinary shares, granted on July 15, 2003, at an adjusted exercise price per ordinary share of £2.7342 (the "July 2003 EIP Option") and an option over 1,202,758 ordinary shares, granted on November 14, 2003, at an adjusted exercise price per ordinary share of £2.8378 (the "November 2003 EIP Option") (together the "EIP Options") to be exercised and to waive the performance conditions attached to the EIP Options (to the extent not already satisfied) having due regard to the performance of the Company over the period of time since the EIP Options were granted; and

4

(iv)    Section 6(g)(ii) of the EIP Agreement to defer the lapse date of the EIP Options until July 15, 2013 (for the July 2003 EIP Option) and November 14, 2013 (for the November 2003 EIP Option) which are the long-stop dates, being the tenth anniversaries of the dates the EIP Options were granted;

(c)    the Remuneration Committee will recommend to the trustee of the Yell Employee Benefit Trust that it should consider transferring to the Executive on or shortly after the Termination Date such number of ordinary shares in the Company as the trustee may determine, but not exceeding the proportion of 6,792,029 ordinary shares subject to the award granted to the Executive on December 23, 2009 under the Yell Group plc Long-Term Incentive Plan ("LTIP"), corresponding to the time which has elapsed from the Award Date (as defined in the LTIP) to the Termination Date, as compared to 36 months;

(d)    In satisfaction of Executive's award over 235,661 ordinary shares under the Yell Group plc Deferred Bonus Plan ("DBP"), such number of Shares in the Company will be transferred to the Executive on or shortly after the Termination Date, subject to the terms and conditions of the DBP; .

(e)    the exercise and/or vesting of any options and/or awards under the ESOS, EIP and DBP ("Share Plans") will be subject to the terms and conditions of the applicable Share Plans. Any cash and/or shares to be acquired by the Executive pursuant to the Share Plans, the Company's employee benefit trust and/or the terms of this Separation Agreement will be subject to all Tax Liabilities. The Executive authorizes the Company, or any group company, to withhold such Tax Liabilities from any payments due to be made to the Executive and/or arrange for the sale of sufficient shares to be sold to meet the Executive's Tax Liabilities; and

(f)    the Chief Executive Officer of Yell Group plc shall announce that Executive has resigned from the Company and Yell Group effective as of the Termination Date to pursue personal interests, and shall issue a formal announcement to that effect, which Executive shall have the opportunity to review prior to issuance.

4.    (a) Following the Termination Date, Executive will be entitled to receive (i) any accrued but unpaid Base Salary through the Termination Date; (ii) any accrued but unpaid bonus for 2010 (if any); (iii) accrued but unpaid vacation through the Termination Date, equivalent to 20 days Base Salary; (iv) reimbursement, within sixty (60) days following his submission of appropriate supporting documentation, for any unreimbursed Business Expenses incurred by him prior to the Termination Date in accordance with Company policy (provided claims for such reimbursement, accompanied by appropriate supporting documentation, are submitted to the Chief Executive Officer of Yell Group plc within ninety (90) days following the Termination Date; (v) any monies deducted from Executive's salary during 2011 under the Yell Group plc 2003 Employee Stock Purchase Plan ("ESPP"); and (vi) any other or additional benefits to which he may be entitled in accordance with the terms of applicable employee benefit plans of the Company or Yell Group plc.

(b) Upon the submission by Executive of an appropriate statement to the Company for reasonable attorneys' fees incurred by Executive and directly related to Executive receiving legal and/or accounting professional advice and representation on the negotiation and execution of this Separation Agreement, up to a maximum of $15,000.00 for all such purposes, the Company will pay or cause to be paid to Executive such amount to Executive's counsel and/or accountant. Such payment will be made by the later of (i) twenty-one (21) days following the expiration of the Rescission Period as defined in Paragraph 15 hereof, and (ii) twenty-one (21) days following the submission by Executive of the statement described in this subparagraph.

(c) The Company agrees not to contest Executive's hiring and employment of his former assistant while employed at the Company after she is severed by the Company, provided that the Executive's former assistant does not violate her duties to the Company with respect to the retention or use of any confidential information or other property of the Company over which she possession, custody or control.

(d) Executive acknowledges that the Company has provided him with the laptop, mobile telephone, facsimile machine and scanner that he used in his office while employed by the Company, with storage drives and memory "wiped", and that Executive may retain these devices.

(e) The Company agrees to provide outplacement services to Executive through a recognized outplacement firm of the Company's choosing, at a cost to the Company of no more than $20,000.00, with the services to be provided in the Washington, DC area.

5.     The Company and Yell Group plc acknowledge the terms of the August 2010 letter relating to the payment to Executive of a retention bonus (the "Retention Bonus Letter"), and shall pay Executive, within five (5) business days following the later of (a) the date stated in the Retention Bonus Letter and (b) the expiration of the Rescission Period as defined in Paragraph 15 hereof, the amount stated in the fourth sentence of the Retention Bonus Letter.

6.     Executive's eligibility to continue participation in the Company's employee benefit plans and programs, including but not limited to medical and dental coverage, accidental death and dismemberment, short and long-term disability insurance, life insurance, annual bonus plan and qualified 401(k) plan, the ESOS, the EIP, the LTIP, the DBP, and the ESPP, will cease as of the Termination Date. Executive will be eligible to continue group health insurance coverage after the Termination Date at his expense in accordance with the provisions of COBRA, provided, however, that the Company will pay Executive's COBRA expenses for a period of 28 weeks with the first such week being the week that commences not less than ten (10) business days after the Rescission Period as defined in Paragraph 15 hereof ends.

7.     Subject to the provisions of Section 4(d) hereof, Executive represents and affirms that he has returned to the Company any Company Property (as hereinafter defined) or "Work Product" (as defined in Section 6 of the Employment Agreement), or any copies thereof, which he may have had in his possession, custody or control, as well as any property or work product of other of the Separation Agreement Parties. As used herein, Company Property shall include, but not be limited to, all records; files; electronic media; equipment; memoranda; manuscripts; reports; intellectual property rights; other literary property, author rights, copyrightable works and works

of authorship in any other media (whether or not copyrightable); client information; client lists; documents; equipment; building keys; corporate credit card; computer; and electronic communication equipment (*i.e.*, laptop, cellular phone, blackberry, etc.); and the like, in which the Company or Yell Group (as applicable) has an interest, whether direct or indirect. If Executive should subsequently discover any such property in his possession, he shall promptly return it and all copies thereof to the Company or Yell Group, as appropriate.

8.      Executive acknowledges his obligation not to disclose or use, at any time, any and all Confidential Information (as defined in Section 5(b) of the Employment Agreement) of the Company, Yell Group and any other of the Released Parties, unless disclosure is required by law, or necessary to respond in an appropriate manner to any legal process or give appropriate and truthful testimony in a legal or regulatory proceeding, and provided, however, that nothing contained in this Section 8 of the Separation Agreement or in Section 5 of the Employment Agreement shall prohibit or limit Executive from testifying truthfully, or disclosing information to government officials strictly in accordance with applicable law. Confidential Information shall not include all such information available to the public through no fault of Executive or information that the Company or the Yell Group does not treat as being confidential. Unless prohibited from doing so by law or at the express request of the applicable law enforcement or regulatory agency, Executive agrees to inform the Chief Executive Officer of the Board of Directors of Yell Group plc and the Company, promptly and in writing, if he is required to give testimony or provide any information to any law enforcement or regulatory agency in connection with the Company's or Yell Group's business practices, setting forth the subject matter of the testimony or speech and identifying the agency.

9.      Executive represents and affirms that he has not filed or asserted any charges, claims or complaints, or initiated any proceedings, against the Company, Yell Group plc or any other of the Released Parties with any court or governmental or regulatory agency, or at arbitration, including making any claim, charge or assertion of wrongdoing of any kind by the Company or Yell Group plc, any of their employees, officers or directors, and that he does not have a basis to make such claim, charge or assertion.

10.     (a)     Executive, for and in consideration of the payments and other benefits that are to be provided to him as set forth in this Separation Agreement, and for other good and valuable consideration, hereby releases and forever discharges, and by this Separation Agreement does release and forever discharge, the Company, Yell Group plc, and all other Released Parties from any  and all causes of action, suits, agreements, promises, damages, disputes, controversies, contentions, differences, judgments, claims debts, dues, obligations, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, variances, trespasses, extents, executions and demands of any kind whatsoever, which Executive or his heirs, executors, administrators, successors and assigns ever had, now have or may have against the Released Parties or any of them, in law, admiralty or equity, whether known or unknown to Executive, for, upon, or by reason of, any matter, action, omission, course or thing whatsoever occurring up to and including the date this Separation Agreement is signed by Executive, including, without limitation, in connection with or in relationship to his employment or other service relationship with any of the Released Parties, the termination of any such employment or service relationship and any applicable employment, compensatory or equity arrangement with the Company or any applicable Released Party, or otherwise; *provided* that such released claims shall not include any

claims to enforce Executive's rights under, or with respect to, this Separation Agreement (such released claims are collectively referred to herein as the "Released Claims").

(b)     Notwithstanding the generality of clause (a) above, the Released Claims include, without limitation, (i) any and all claims under Title VII, ERISA, FLSA, ADA, the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 et seq., the Equal Pay Act, as amended, 29 U.S.C. § 206(d), SOX, ADEA, FMLA, the Reconstruction Era Civil Rights Act, as amended, 42 U.S.C. § 1981 et seq.; and (ii) any and all other federal, state or local laws, statutes, rules and regulations pertaining to employment or otherwise, and (iii) any claims for wrongful discharge, breach of contract, fraud, misrepresentation, unjust enrichment or any compensation claims, or any other claims under any statute, rule or regulation or under the common law, including compensatory damages, punitive damages, attorney's fees, costs, expenses and all claims for any other type of damage or relief.

(c)     **THIS MEANS THAT, BY SIGNING THIS SEPARATION AGREEMENT, EXECUTIVE WILL HAVE WAIVED ANY RIGHT HE MAY HAVE HAD TO BRING A LAWSUIT OR MAKE ANY CLAIM AGAINST THE RELEASED PARTIES BASED ON ANY ACTS OR OMISSIONS OF THE RELEASEES UP TO THE DATE OF THE SIGNING OF THIS SEPARATION AGREEMENT.**

(d)     The Company and Yell Group plc, for and in consideration of the obligations upon Executive as set forth in this Separation Agreement, and for other good and valuable consideration, hereby release and forever discharge, and by this Separation Agreement does release and forever discharge, Executive from any and all causes of action, suits, agreements, promises, damages, disputes, controversies, contentions, differences, judgments, claims debts, dues, obligations, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, variances, trespasses, extents, executions and demands of any kind whatsoever, which the Company and Yell Group plc or their subsidiaries, affiliates, administrators, successors and assigns (the "Company Releasors") ever had, now have or may have against Executive in law, admiralty or equity, whether known or unknown to the Company Releasors, for, upon, or by reason of, any matter, action, omission, course or thing whatsoever occurring up to and including the date this Separation Agreement is signed by the Company Releasors, including, without limitation, in connection with or in relationship to Executive's employment or other service relationship with any of the Released Parties, the termination of any such employment or service relationship and any applicable employment, compensatory or equity arrangement with the Company or any applicable Released Party, or otherwise; *provided* that such released claims shall not include any claims to enforce any of the Company Releasors' rights under, or with respect to, this Separation Agreement or the benefit and compensation plans expressly referred to herein, and *provided further*, that such released claims shall not include any claims by any of the Company Releasors based upon conduct by Executive which constitutes a crime or is fraudulent under applicable law.

11.     Except as expressly set forth in this Separation Agreement, Executive expressly understands and agrees that the obligations upon the Company and Yell Group plc under this Separation Agreement are in lieu of any and all other amounts to which Executive might be, is now or may become entitled to receive from the Company, Yell Group plc or any other of the Released Parties upon any claim whatsoever and, without limiting the generality of the

8

foregoing, Executive expressly waives any right or claim that he may have or assert to employment, reinstatement to employment, or payment for back pay, front pay, interest, bonuses, equity pool participation, discretionary investments, damages, vacation, sick leave, medical, dental, optical or hospitalization benefits, accidental death and dismemberment coverage, long term disability coverage, stock-based options or awards, pensions, expense reimbursements, education benefits, automobile usage benefits, life insurance benefits, overtime, severance pay, separation pay, liquidated damages and/or attorneys' fees or costs, arising from or derivative of the Employment Agreement, his employment with the Company, his separation from employment with the Company or the Yell Group, or otherwise.

12.    (a)    Executive hereby covenants and agrees, as a condition of the Company's and Yell Group plc's performance of their obligations arising from this Separation Agreement, that Executive: (i) has not disclosed and shall not disclose the terms of this Separation Agreement to anyone, except and to the extent required by law, provided, however, that this does not and shall not preclude disclosure about the terms of this Separation Agreement to Executive's immediate family members, counsel, and financial, personal and tax advisors (if any) or governmental taxing authorities; (ii) has instructed his immediate family members, counsel, and financial, personal and tax advisors (if any) to whom he has disclosed or may disclose the terms of this Separation Agreement not to disclose the terms and conditions of this Separation Agreement to anyone except where failure to disclose would constitute a violation of law or contempt of court; and (iii) will not make any untrue, negative or derogatory statements or remarks about the Company or Yell Group plc, or any of their employees, directors, agents or officers (past, present or future) or any other of the Released Parties except that this shall not prevent any person from giving true testimony pursuant to subpoena and under oath in any proceeding.

       (b)    Executive further agrees that any material violation or breach by him of any of the obligations set forth in Paragraphs 7, 8, 9 or 12(a) of this Separation Agreement will give rise on the part of the Company and Yell Group plc to a claim for relief to recover from Executive, before a court of competent jurisdiction in New York City, the full amounts paid to Executive under Paragraph 3 hereof, and to obtain all other remedies provided by law or equity, but shall not release Executive from the performance of his obligations under this Separation Agreement.

       (c)    The Company and Yell Group plc agree that Tony Bates, Bob Gregerson, Rob Hall, Mark Payne, Mike Pocock, John Salmond and Christian Wells will not make any untrue, negative or derogatory statements or remarks about Executive except that this shall not prevent any person from giving true testimony pursuant to subpoena and under oath in any proceeding.

13.    Notwithstanding anything herein to the contrary, (a) if at the time of the Termination Date, Executive is a "specified employee" as defined in Section 409A of the U.S. Internal Revenue Code (the "Code") and the deferral of the commencement of any payments or benefits otherwise payable hereunder as a result of Employee's termination of employment is necessary in order to prevent any accelerated or additional tax under Section 409A of the Code, then the Company (or Yell Group plc, as applicable) will defer the commencement of the payment of any such payments or benefits hereunder (without any reduction in such payments or benefits ultimately paid or provided to Executive) until the date that is six months following the Termination Date (or the earliest date as is permitted under Section 409A of the Code), and (b) if any other payments of money or other benefits due to Executive hereunder could cause the

application of an accelerated or additional tax under Section 409A of the Code, such payments or other benefits shall be deferred if deferral will make such payment or other benefits compliant under Section 409A of the Code, or otherwise such payment or other benefits shall be restructured, to the extent possible, in a manner, determined by the Board, that does not cause such an accelerated or additional tax. The Company and Yell Group plc shall consult with Executive in good faith regarding the implementation of the provisions of this Section 14; *provided* that neither the Company, Yell Group plc, nor any of their employees or representatives shall have any liability to Executive with respect to thereto.

14.    (a)    The Company, Yell Group plc and Executive agree to execute such other documents and to take such other actions as may be reasonably necessary to effect the terms of this Separation Agreement.

(b)    Executive acknowledges and agrees that he has read carefully and fully understands the terms of this Separation Agreement and that, in deciding to execute this Separation Agreement, he has relied entirely upon his own judgment, and that he has had the opportunity to consult with legal, financial and other personal advisors of his own choosing as he deems appropriate, in assessing whether to execute this Separation Agreement. Executive represents and acknowledges that no representation, statement, promise, inducement, threat or suggestion has been made by the Company, Yell Group plc or any other of the Released Parties to influence his decision to sign this Separation Agreement except such statements as are expressly set forth in this Separation Agreement. Executive understands that he has been advised by the Company and Yell Group plc to consult with counsel prior to executing this Separation Agreement, and that he has been given at least twenty-one (21) days to consider its terms and effect and to consult with, and to ask any questions that he may have of his legal counsel and other personal advisors of his own choosing, and that he has executed this Separation Agreement voluntarily and with full understanding of its terms and effect. Executive further agrees that no fact, evidence, event or transaction currently unknown to him but which later may become known to him shall affect in any way or manner the final and unconditional nature of this Separation Agreement.

15.    Executive understands that he has a period of seven (7) days following the date on which he signs this Separation Agreement to revoke such signature (the "Rescission Period"). Accordingly, this Separation Agreement shall not become effective until the eighth (8th) day following the date on which Executive signs this Separation Agreement as indicated below.  No payments shall be due, owing or paid by the Company or Yell Group plc under this Separation Agreement unless and until the Separation Agreement becomes effective upon expiration of the Rescission Period. To revoke his execution of this Separation Agreement, Executive must send a written statement of revocation to the Chief Executive Officer of the Board of Directors of Yell Group plc, which statement of revocation must be received no later than 5:00 p.m. on the seventh (7th) day following Executive's execution of this Separation Agreement.

16.    The foregoing represents the entire agreement among Executive, the Company and Yell Group plc and except as expressly set forth in this Separation Agreement, supersedes all prior agreements or understandings, written or oral, between or among them (except for the Retention Bonus Letter) which are hereby no longer of any force or effect and are extinguished. This

10

Separation Agreement may not be changed or modified except by a written instrument signed by each of Executive, the Company and Yell Group plc.

17.     Each party to this Separation Agreement agrees that if any section of this Separation Agreement is determined to be void, voidable or unenforceable, it shall have no effect on the remainder of the Separation Agreement which shall remain in full force and effect.

18.     This Separation Agreement shall be governed by the laws of the State of New York.

Dated: as of October 20, 2011            YELLOWBOOK INC.


                                         By: CHRISTIAN HENRY WELLS
                                         Its: GROUP GENERAL COUNSEL AND COMPANY SECRETARY

                                         YELL GROUP PLC


                                         By: CHRISTIAN HENRY WELLS
                                         Its: GROUP GENERAL COUNSEL AND COMPANY SECRETARY


                                         _____
                                         JOSEPH WALSH


STATE OF _____ )
                   : ss.:
COUNTY OF _____ )

            On the __ day of December, 2011, before me personally came Joseph Walsh, to me known and known to me to be the individual described herein and who executed the foregoing Separation Agreement and General Release, and duly acknowledged to me that he executed the same.

                                         _____
                                         Notary Public

(Seal)

FILED: NEW YORK COUNTY CLERK 04/26/2013

NYSCEF DOC. NO. 3

INDEX NO. 651503/2013

RECEIVED NYSCEF: 04/26/2013

# EXHIBIT B



FILED: NEW YORK COUNTY CLERK 04/26/2013

NYSCEF DOC. NO. 4

INDEX NO. 651503/2013

RECEIVED NYSCEF: 04/26/2013

# EXHIBIT C

Mr. Joseph Walsh
Walsh Partners
11600 Partridge Run Lane
Potomac, MD 20854

**CONFIDENTIAL**

October 24, 2012

*Via Electronic Mail*

Mr. Christopher Wilson
Managing Director
Houlihan Lokey
10250 Constellation Boulevard
Los Angeles, CA 90067

**RE: Acquisition of Yellowbook Inc.**

Dear Mr. Wilson:

Pursuant to our discussion on October 18, 2012, I would like to formally confirm my interest in submitting an offer to purchase Yellowbook Inc. ("Yellowbook" or the "Company") along with Platinum Equity, LLC ("Platinum"), the equity sponsor with whom I partnered to submit an offer to acquire the Company in early 2011. Platinum has extensive familiarity with Yellow Book, the management team and the directory industry as a result of that process and the combination of their knowledge, operational capabilities and experience makes them an ideal partner when combined with my 24 years at the Company, including 18 years as the CEO.

While we are well aware of the continued downward pressures facing the industry and the Company, we also believe we have the knowledge and experience to significantly slow the current rate of decline in the business. During my tenure as CEO, Yellowbook consistently outperformed its comparable peer group during times of industry expansion and contraction. We can build on that proven track record and adapt to meet the needs of the changing marketplace. A level of focused investment in new products is essential, but we feel strongly that optimizing and continuing to evolve the Company's most significant asset, its existing cash flow stream from the print operations and internet yellow pages, is critical to maintaining profitability.

It would seem hibū is at a crossroads and the magnitude of the economic recovery for the lending group is at stake. Appointing a restructuring executive to cut costs will not improve the current situation and is likely to make it worse. An intimate knowledge of the products, services and marketplaces is an absolute requirement to make significant, but surgically targeted, cost reductions. A universal approach focused on deep cost cutting without strong product leadership and a focus on improving results will almost certainly impair the remaining earnings potential of the business.

The Company is fragile; it lacks direction and momentum. Morale is at an all-time low. Trying yet another big fix is risky. Selling off the various business units is the surest path to optimize recovery for the lending group.

After many years of building Yellowbook and assembling the current management team, I believe we have the ability to restore employee morale, refocus the Company on its core competencies and quickly return to outperforming the industry as we did consistently prior to the arrival of current hibü management. Additionally, we have the operational and functional knowledge and experience to separate Yellowbook from the larger corporate enterprise with no disruption to the other operations. The option we are presenting will provide the best possible alternative for the lending group with the greatest certainty of success.

Based on recent transactions for YP Holdings and the pending restructuring of Yellow Media, we would propose a purchase price of $400 million for the Yellowbook business and www.yellowbook.com. Under this structure, hibü would retain all partnerships, agreements and business operations entered into as a part of the new strategy including the Houston based consumer business, the Seattle based digital advertising business, the US Hispanic initiative and Znode. Our proposal is equal to 1.6x current EBITDA, which we are assuming to be $250 million for the fiscal year end March 31, 2013, and 2.0x projected EBITDA for fiscal year ended March 31, 2014, which we are assuming to be $200 million. Our proposed structure would contemplate equity financing of $100 million to be provided by Platinum and the remaining funds to be provided via a rollover of debt by the existing lenders on mutually agreeable terms. The existing lenders would also receive a warrant package which would facilitate additional economic recovery.

We are prepared to submit a non-binding indication of interest, commence due diligence immediately and work in good faith to submit a binding offer. Assuming the full participation of the Company we believe we can close a transaction by the end of this calendar year. Appreciating the crisis state of affairs within the Company, we are concerned that Yellowbook may be irreparably harmed by near-term operational maneuvering. Our interest is based on our understanding of the current US operating structure and team, and any restructuring or termination of key personnel may impact our interest in the Company.

We look forward to further discussing this opportunity with you. I can be reached at +1 301-280-5105 if you have any questions.

Sincerely,

Joseph Walsh

Joseph Walsh

cc: Louis Samson
    David Glatt
    David Dunn

# EXHIBIT 2

FILED: NEW YORK COUNTY CLERK 05/09/2013
NYSCEF DOC. NO. 5

INDEX NO. 651503/2013
RECEIVED NYSCEF: 05/09/2013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

HIBU plc f/k/a YELL GROUP plc, and )
HIBU, Inc. f/k/a YELLOWBOOK, Inc., )
        *Plaintiffs*, )
                 ) Index No. 651503/2013
                 )
        v. )
JOSEPH WALSH, )
        *Defendant*. )
                 )

## AFFIDAVIT OF SERVICE

State of Maryland      }
County of Montgomery }   ss.:

The undersigned, being duly sworn, deposes and says;

Deponent is not a party herein, is over 18 years of age and resides in the state of Maryland.

That on **5/6/13 at 7:03 PM at 11600 Partridge Run Lane, Potomac, MD 20854**

deponent served a(n) **Notice of Commencement of Action Subject to Mandatory Electronic Filing;
Summons and Complaint** on **Joseph Walsh**, by delivering thereat a true copy of each to **Mrs. Walsh**
(wife, refused to give her first name), a person of suitable age and discretion. Said premises is
defendant's usual place of abode within the state.

Within 20 days of such delivery, deponent enclosed a copy of same in a postpaid envelope properly
addressed to defendant at defendant's last known residence, at **11600 Partridge Run Lane, Potomac,
MD 20854** and deposited said envelope in an official depository under the exclusive care and custody
of the U.S. Postal Service within Maryland State. **Mailed copy on 5/7/13 at 2:00 PM.**

I asked the person spoken to whether recipient was in active military service of the United States or of
the State of New York in any capacity whatever and received a negative reply. The source of my
information and the grounds of my belief are the conversations and observations above narrated.
Upon information and belief I aver that the recipient is not in military service of New York State or of
the United States as that term is defined in either the State or in the Federal statutes.

Description of Person Served:
Gender: Female    Skin: White           Hair: Brown      Age: 35-50 Yrs.
Height: 5'4"-5'8"   Weight: 131-160 Lbs.   Other:

Sworn to before me this
7th   day of May, 2013

Notary Public                                      Ricky Ordonez
Christina S. Thompson
Serving By Irving, Inc. — 233 Broadway, Suite 2201, New York, NY 10279

CHRISTINA S. THOMPSON
NOTARY PUBLIC STATE OF MARYLAND
County of Washington
My Commission Expires March 1, 2015

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

HIBU plc f/k/a YELL GROUP plc, and )
HIBU, Inc. f/k/a YELLOWBOOK, Inc.,    )    Index No.: 651503/2013
)
            *Plaintiffs*,                        )
)
        v.                                    )
)
JOSEPH WALSH,                           )
)
            *Defendant*.                         )
)

## PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

Pursuant to Article 31 of the New York Civil Practice Law and Rules, Plaintiffs hibu plc f/k/a/ Yell Group plc ("hibu") and hibu, Inc. f/k/a Yellowbook, Inc. ("hibu US") request that Defendant Joseph Walsh produce the documents designated below for examination and copying at the office of Kirkland & Ellis LLP, 300 N. LaSalle St., Chicago, IL 60654 within thirty (30) days of service, or as otherwise agreed by the parties or ordered by the Court.

### DEFINITIONS

1.      "Communication" shall mean the transmittal or exchange of information in the form of facts, ideas, inquiries or otherwise, whether orally or in writing, including but not limited to electronic communications.

2.      The term "document" as used in these requests shall be construed as broadly as permitted under the New York Rules of Civil Procedure and includes any kind of written, typewritten, printed, graphic, or recorded material whatsoever, including but not limited to notes, memoranda, letters, electronic mailings, reports, telegrams, publications, contracts, drawings,

8.    "Discussion" shall mean oral communications or non-verbal conduct intended as a communication.

9.    "Meeting" shall mean any assembly, convocation, encounter, or contemporaneous presence of two or more persons for any purpose, whether or not planned, arranged, or scheduled in advance.

10.    "Relating" or "relating to" means constituting, containing, evidencing, demonstrating, quantifying, showing, disclosing, describing, explaining, supporting, summarizing, mentioning, concerning, pertaining and/or referring to, directly or indirectly.

11.    The "Employment Agreement" shall refer to the July 1, 2006 Employment Agreement between Defendant Joseph Walsh and hibu.

12.    The "Separation Agreement" shall refer to the Separation Agreement and General Release entered by Defendant Joseph Walsh, hibu, and hibu US on December 1, 2011.

13.    "Confidential Information" has the same meaning as contained in section 5(b) of the Employment Agreement as incorporated into the Separation Agreement.

## INSTRUCTIONS

1.    In producing documents, you shall furnish all documents or materials in your possession, custody or control, regardless of whether such documents or materials are possessed directly by you or your directors, officers, partners, members, agents, employees, representatives, subsidiaries, or by your attorneys or their agents, employees, representatives or investigators. A document shall be deemed in your possession, custody or control if it is in your physical custody, or if it is in the physical custody of any person and you (a) own such document in whole or part; (b) have a right, by contract, statute or otherwise to use, inspect, examine, or copy such document on any terms; (c) have an understanding, express or implied, that you may use,

3

inspect, examine, or copy such document on any terms; or (d) have, as a practical matter, been able to use, inspect, examine or copy such document when you sought to do so.

2.    Documents shall be produced in the form in which they are ordinarily kept. Thus, documents kept in electronic format (such as documents maintained on a computer system) should be produced in their native format, where practicable. Documents that are kept in paper format may be produced either in paper format or be converted to electronic format and produced as PDF files or tiff images.

3.    Documents shall be produced from both personal and work locations, including but not limited to all personal and work computers, hard drives, mobile devices, files, and any other location where data in any format is stored.

4.    Requests for documents concerning any subject matter include documents concerning communications regarding that subject matter.

5.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a request all documents or information that might otherwise be construed as outside its scope.

6.    The singular form of a noun or pronoun includes the plural form, and the plural form includes the singular.

7.    All words herein, except for those terms specifically defined above, shall be given their plain and ordinary meaning given the context of their use to make the discovery request inclusive rather than exclusive.

8.    All terms specifically defined above shall be given the meaning ascribed to them in the definitions herein. Additionally, these defined terms shall be given their plain and

ordinary meaning in the context of their use to the extent doing so does not contradict their meaning as ascribed herein.

9.   If you withhold any responsive document on the basis of privilege or other purported immunity from disclosure, please provide the following information:

(i)   A statement of the basis for the claim of privilege or other immunity from disclosure;

(ii)   the date of the document;

(iii)   the document's authors, recipients, and all persons copied on the document and, if applicable, their titles and employers;

(iv)   a description of the subject matter of the document that is sufficient to enable Plaintiffs to assess the merits of your claim of privilege.

10.   Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and, in writing at the time of production, state with particularity the reason or reasons it is not being produced in full and describe to the best of your knowledge, information and belief, with as much particularity as possible, those portions of the document that are not being produced.

11.   If a document responsive to these requests was at any time in your possession or control but is not longer available for production, state as to each document:

(i)   Whether the document is missing or lost;

(ii)   Whether the document has been destroyed;

(iii)   Whether the document has been transferred or delivered to another person or entity and, if so, at whose request;

(iv)   Whether the document has otherwise been disposed of; and

(v)   All circumstances surrounding the disposition of the document, including the date of the document's disposition and the authorization for such disposition.

5

## REQUESTS FOR PRODUCTION

1.     All communications with any former or current hibu employee, including but not limited to emails, text messages or any other form of electronic communication, since the date of your termination from hibu on October 20, 2011.

2.     Records or other documents showing the number and/or content of telephone calls (including voicemails) made to or from former or current hibu employees, whether in your possession or in the possession of a person or entity from whom you have a right, pursuant to statute, contract or otherwise, to inspect or examine such records or documents.

3.     All notes, minutes, memoranda or other documents reflecting any meeting or discussion with any current or former hibu employee.

4.     All documents reflecting communications to any person about hibu or its former or current employees, directors, agents or officers, or any other of the "Released Parties" as defined in the Separation Agreement.

5.     All communications between you and Platinum Equity, LLC and/or its agents, attorneys, consultants, employees, officers, directors, representatives, predecessors, successors, affiliates and subsidiaries.

6.     All communications between you and any person or entity seeking to acquire or expressing any interest in acquiring all or part of hibu US, including but not limited to private equity firms, relating in any way to any such acquisition.

7.     All communications between you and Houlihan Lokey and/or its agents, attorneys, consultants, employees, officers, directors, representatives, predecessors, successors, affiliates and subsidiaries.

6

8.      All documents and communications relating to your October 24, 2012, offer to purchase all or part of hibu US.

9.      All communications between you and the CoCom and/or its agents, attorneys, consultants, employees, officers, directors, representatives, and affiliates.

10.     All letters, notes, memoranda, or other documents directed to the CoCom prepared by you or, if in your possession, by any former or current hibu employee, whether in draft or final form and whether or not sent to or received by the CoCom.

11.     All communications between you and any member of the hibu Board of Directors.

12.     All Confidential Information of hibu in your possession.

13.     All information, in any format, confidential or otherwise, you received, exchanged, or shared regarding hibu in any capacity since the date of your termination from hibu on October 20, 2011.

14.     All notes, minutes, memoranda or other documents reflecting any meeting or discussion with any industry group or trade association related in any way to the industry or industries in which hibu or hibu US operate, since the date of your termination from hibu on October 20, 2011.

15.     All presentations, including drafts, made to any industry group or trade association related in any way to the industry or industries in which hibu or hibu US operate, since the date of your termination from hibu on October 20, 2011.

16.     All communications, including any drafts, to or from the missy.walsh@comcast.net email account concerning hibu, including but not limited to hibu Confidential Information, current or former hibu employees or management, and your bid to purchase hibu US.

7

17.    All communications to or from email accounts under the names of "Cynthia Cooper" or "Martin Felt."

18.    All documents and communications relating to any email accounts under the names of "Cynthia Cooper" or "Martin Felt."

Dated: May 1, 2013                                    KIRKLAND & ELLIS LLP
       New York, New York

                                                     *[signature: Peter A. Bellacosa]*
                                                     _____
                                                     Peter A. Bellacosa
                                                     601 Lexington Avenue
                                                     New York, NY 10022
                                                     Telephone: (213) 680-8400
                                                     Facsimile: (213) 680-8500

                                                     Andrew R. McGaan, P.C.
                                                     Matthew E. Nirider
                                                     Rana Barakat
                                                     300 N. LaSalle
                                                     Chicago, IL 60654
                                                     Telephone:  (312) 862-2000
                                                     Facsimile:  (312) 862-2200

8

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

———————————————————————————x

HIBU plc f/k/a YELL GROUP plc, and
HIBU, Inc. f/k/a YELLOWBOOK, Inc.,

                          Plaintiff/Petitioner,

          - against -                                    Index No. 651503/2013

JOSEPH WALSH,

                          Defendant/Respondent.

———————————————————————————x

## NOTICE OF COMMENCEMENT OF ACTION
## SUBJECT TO MANDATORY ELECTRONIC FILING

PLEASE TAKE NOTICE that the matter captioned above, which has been commenced by filing of the accompanying documents with the County Clerk, is subject to mandatory electronic filing pursuant to Section 202.5-bb of the Uniform Rules for the Trial Courts. This notice is being served as required by Subdivision (b) (3) of that Section.

The New York State Courts Electronic Filing System ("NYSCEF") is designed for the electronic filing of documents with the County Clerk and the court and for the electronic service of those documents, court documents, and court notices upon counsel and self-represented parties. Counsel and/or parties who do not notify the court of a claimed exemption (see below) as required by Section 202.5-bb(e) must immediately record their representation within the e-filed matter on the Consent page in NYSCEF. Failure to do so may result in an inability to receive electronic notice of document filings.

Exemptions from mandatory e-filing are limited to: 1) attorneys who certify in good faith that they lack the computer equipment and (along with all employees) the requisite knowledge to comply; and 2) self-represented parties who choose not to participate in e-filing. For additional information about electronic filing, including access to Section 202.5-bb, consult the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center at 646-386-3033 or efile@courts.state.ny.us.

Dated: 4/26/2013

_Peter A. Bellacosa_ (Signature)

Peter A. Bellacosa (Name)

Kirkland & Ellis LLP (Firm Name)

601 Lexington Avenue (Address)

New York, NY 10022

212-446-4800 (Phone)

pbellacosa@kirkland.com (E-Mail)

To:   Joseph Walsh
      11600 Partridge Run
      Lane

      Potomac, MD 20854

4/8/11



# NYSCEF - New York County Supreme Court
# Confirmation Notice

This is an automated response for Supreme Court / Court of Claims cases. The NYSCEF site has received your electronically filed document(s) for:

hibu plc f/k/a Yell Group plc et al - v. - Joseph Walsh

651503/2013

## Documents Received

| Doc # | Document Type | Motion # | Date Received |
|-------|---------------|----------|---------------|
| 1 | SUMMONS + COMPLAINT | | 04/26/2013 10:29 AM |
| 2 | EXHIBIT(S) A | | 04/26/2013 10:29 AM |
| 3 | EXHIBIT(S) B | | 04/26/2013 10:29 AM |
| 4 | EXHIBIT(S) C | | 04/26/2013 10:29 AM |

## Filing User

| | | | |
|---|---|---|---|
| Name: | PETER A BELLACOSA | | |
| Phone | 212-446-4800 | E-mail Address: | pbellacosa@kirkland.com |
| Fax #: | | Work Address: | 601 Lexington Avenue New York, NY 10022 |

## E-mail Notifications

An e-mail notification regarding this filing has been sent to the following address(es) on 04/26/2013 10:29 AM:

BELLACOSA, PETER A - pbellacosa@kirkland.com

NOTE: If submitting a working copy of this filing to the court, you must include as a notification page firmly affixed thereto a copy of this Confirmation Notice.

E-mail: EFile@nycourts.gov      Phone: (646) 386-3033      Fax: (212) 401-9146      website: www.nycourts.gov/efile